## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON

**ROGER DWAYNE SMITH,**

                    **Plaintiff,**

**v.**                                                    **Case No. 2:14-cv-17001**

**JOSHUA HYPES, Correctional Officer,**
**DANIEL HAHN, Correctional Officer,**
**DAVID BALLARD, Warden,**
**Mount Olive Correctional Complex,**
**JIM RUBENSTEIN, Commissioner, West Virginia**
**Division of Corrections,**
**SHANNA COLEMAN, Mental Health Counselor,**
**MEREDITH SMITH, Mental Health Doctor, and**
**SHERRILL SNYDER, Mental Health Director,**
**each in their individual and official capacities,**

                    **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court is a Motion to Dismiss filed by defendants Rubenstein, Ballard, Hahn and Hypes (hereinafter collectively referred to as the "DOC Defendants." (ECF No. 17).[1]

---

[1] The plaintiff has also named as defendants three employees of the contracted mental health care provider at MOCC, Shanna Coleman, Meredith Smith and Sherrill Snyder. On October 31, 2014, default was entered against these defendants for their failure to timely answer the plaintiff's Complaint. Pending before the court are the plaintiff's Motion to Compel Defendants Coleman, Smith and Snyder to Answer Complaint (ECF No. 27) and a Motion to Set Aside Default filed by defendants Coleman, Smith and Snyder (ECF No. 39). These motions will be addressed in a separate document.

## <u>PLAINTIFF'S ALLEGATIONS AND FACTUAL BACKGROUND</u>

The plaintiff's Complaint (ECF No. 1) arises from an alleged use of force against the plaintiff on September 1, 2013.   The plaintiff alleges that he was sprayed with two bursts of "pepper spray," and was verbally abused and threatened by correctional officers Hypes and Hahn, in violation of his Eighth Amendment rights.   The plaintiff further alleges that defendants Ballard and Rubenstein (hereinafter "the Supervisory Defendants") have been put on notice of the widespread use of pepper spray in an excessive manner by correctional officers at MOCC through numerous grievances and lawsuits filed by inmates who have been subjected to this conduct, and that defendant Ballard has actually encouraged this conduct through the implementation of a policy known at the prison as "Martial Law."   The plaintiff further alleges that Ballard and Rubenstein have chosen to ignore the issue and have failed to take any action against the offending officers.

Specifically, the Complaint alleges that, on August 26, 2013, the plaintiff, who was housed in the Quilliams II segregation unit (hereinafter sometimes referred to as "Q-2") at the Mount Olive Correctional Complex ("MOCC"), was told by a correctional officer that "the Warden authorized the Quilliams II unit of MOCC to be put under Martial Law."   (ECF NO. 1 at 5, ¶ 13).   The plaintiff further alleges that he "filled out a request form to see if there was any truth to this, and plaintiff got a response back stating, "Per Warden, Martial Law is a condition that MOCC utilizes."   (*Id.*, ¶ 14 and Ex. 1).

Then, on August 28, 2013, the plaintiff alleges that he requested that officers in the Q-2 unit contact the mental health unit and ask that someone come see the plaintiff due to his anxiety attacks and depression.   (*Id.*, ¶ 15).   The plaintiff alleges that he was

2

told to complete a sick call request, which he did.   (*Id.*, ¶ 16).   The plaintiff further alleges that, on September 1, 2013, he again asked several officers to get someone from mental health to come see him, as he was having feelings of helplessness, depression and anxiety, due to some family issues.   (*Id.,* ¶ 17).   The plaintiff alleges that he told the officers he was having a mental breakdown and needed help, but no help was provided. (*Id.*, ¶¶ 18-19).

The plaintiff further alleges that he began to have suicidal thoughts and began hitting his emergency call button.   (*Id.*, ¶ 20).   Eventually, Cpl. Hudson responded and told the plaintiff that no one from mental health was there to help him and to stop hitting his call button, sit on his bunk and shut up.   (*Id.*, ¶¶ 21-22).   The plaintiff further alleges that, when he persisted in claiming that someone had to be present or on call for emergencies, Cpl. Hudson threatened to spray him with pepper spray "if he kept it up" and then Hudson left the pod.   (*Id.*, ¶¶ 23-24).

The plaintiff further alleges that he started to flood his cell in order to try to get some help.   (*Id.*, ¶ 25).   Then, Samuel Ramsey, an inmate in a neighboring cell, also started to flood his cell.   (*Id.*, ¶ 26).   The plaintiff's Complaint further alleges that Cpl. Hess, Cpl. Hudson, Officer Hypes, Lt. Hahn and some other unidentified officers came into the pod and shut off the water to both cells.   (*Id.*, ¶ 27).   He further alleges that, "with no warning or direct orders to stop doing anything," the correctional officers opened inmate Ramsey's food slot, sprayed Ramsey with chemicals, shut the food slot and left Ramsey inside for about 10 minutes before returning to extract Ramsey.   (*Id.*, ¶¶ 28-30).   The plaintiff further alleges that, in violation of West Virginia Division of Corrections' policies, the use of force against Ramsey was not video recorded, although

3

his extraction was.   (*Id.*, ¶¶ 31-32).

The plaintiff further alleges that, after removing Ramsey from his cell, Officer Hypes and Lt. Hahn returned to the pod and opened the plaintiff's food slot.   (*Id.*, ¶ 33). The Complaint further alleges as follows:

34.   Officer Hypes and Lt. Hahn got into a pushing and shoving match over who was going to spray plaintiff and with no warning or direct order to stop doing anything plaintiff was sprayed for several seconds in the face and private area with chemicals by Lt. Hahn.

35.   Plaintiff was standing about six feet from his cell door in only boxer shorts when he was sprayed with the chemicals in the face and private area.

36.   Plaintiff was not refusing any orders from officers nor was plaintiff a risk to staff or others or himself.

37.   Plaintiff was no longer flooding his cell either, because plaintiff's water was turned off 15 to 20 minutes earlier when officers first came into the pod and sprayed plaintiff's neighbor.

38.   After plaintiff was sprayed with the chemicals the officers left the pod after shutting the food slot.

39.   Plaintiff was in an excessive amount of pain and couldn't breathe and was really panicing [sic; panicking].

40.   Plaintiff was forced to use the only means of water he had which was the water left in his toilet, to try to get the excessive amount of pepper spray off of him.

41.   Plaintiff felt humiliated and dehumanized that he had to use water out of his toilet to try and relieve the pain he was in due to the excessive amount of pepper spray Lt. Hahn used.

42.   Plaintiff was already going through a mental breakdown and asking for help, and then was assaulted for asking for help.

43.   Plaintiff was not harming himself, nor was he harming another inmate, nor was he harming an officer, nor was he destroying any property of the state.

44. Plaintiff does not understand why the use of force was necessary because plaintiff was not refusing any order nor was plaintiff flooding at time of use of force because plaintiff's water was already turned off and nor was plaintiff refusing to come out of his cell.

45. Plaintiff posed no risk at all to himself or others.

(*Id.* at 8-10, ¶¶ 34-45).   The plaintiff further alleges that, after being left in his cell for some time, officers returned with video in hand and asked the plaintiff if he was ready to come out of his cell.   (*Id.*, ¶¶ 46-47).   The plaintiff told the officers he was in severe pain, cuffed up and was taken to the recreation yard for decontamination and to be seen by a nurse.   (*Id.*, ¶¶ 48-49).

The plaintiff further alleges that he was placed on a steel stool and Lt. Hahn asked him why he flooded his cell.   (*Id.*, ¶ 50).   The plaintiff states that he told Lt. Hahn he had been asking to see mental health for almost a week, but his requests were being ignored, and he couldn't take it anymore.   (*Id.*, ¶ 51).   The plaintiff further alleges that Lt. Hahn stated that he was unaware of the plaintiff's problems and would contact mental health that night.   (*Id.*, ¶ 53).   The plaintiff alleges that he told Lt. Hahn that there wouldn't be any more problems if he got to see mental health.   (*Id.*, ¶ 54).

The plaintiff further alleges that the water in the shower in which he was placed to be decontaminated was too hot and that he could barely stand under the water.   (*Id.*, ¶¶ 58-62).   The plaintiff further alleges that, although he was given a towel to dry off with, he was not given a clean pair of boxer shorts and had to wear the pair that had chemicals on them.   (*Id.* at 13, ¶ 64).   The plaintiff further alleges that officers cleaned his walls with a wash cloth and cleaner, but the plaintiff was told he would have to clean the floor and water himself.   (*Id.*, ¶¶ 65-67).   The plaintiff alleges that his hands and feet became

very sore and he experienced burning and severe pain from the chemicals.   (*Id.*, ¶¶ 67-68).

The plaintiff alleges that he subsequently filed a grievance about this incident and not being properly decontaminated and was told that the Use of Force Committee would review the incident, despite the fact that there was no recording of it.   (*Id,* ¶¶ 69, 74). The plaintiff also filed sick call requests seeking to see a doctor or physician's assistant about his injuries and also to see mental health.   (*Id.*, ¶¶ 70-73, 75).   The plaintiff further alleges that, around 11:00 p.m. on September 3, 2013, the plaintiff showed the nurse who had decontaminated him his face, arms, chest, hands, legs and feet and the nurse called a doctor to get orders to treat the plaintiff for first degree burns.   (*Id.*, ¶¶ 76-78 and Ex. 4).   The plaintiff further alleges that he still had not been seen by anyone from mental health.   (*Id.*, ¶ 79).

The remaining factual allegations in the plaintiff's Complaint concern the plaintiff's attempts to be seen by someone from the mental health contractor and his suicidal ideations.   The mental health defendants are not the subject of the instant Motion to Dismiss.   Thus, the undersigned will not specifically address those allegations at this time.

The plaintiff alleges that, at the time he filed his Complaint, no one from the Use of Force Committee had spoken to him about the incident, and he did not know if the incident had been investigated or reviewed.   (*Id.* at 28, ¶ 158).   The plaintiff also alleges that he has been denied copies of the photographs that were taken of his injuries on September 9, 2013.   (*Id.*, ¶ 160).

The plaintiff further alleges that:

167.   At this facility, superiors or supervisors allow subordinates to:   (1) use chemical agents on inmates or use excessive force for refusing orders that are not detrimental to the safety and security of the institution or to maintain and restore order; (2) use no efforts to temper a situation before the use of force on segregation inmates locked securely in their cells; and (3) violates policies such as but not limited to the less-lethal use of force policy and calculated use of force policy as seen in the following exhibits (See Exhibits # 26-33).

168.   To this day, plaintiff still suffers paranoia and anxiety and panic attacks and carries the scars from the 1st degree chemical burns and cuts on wrists due to the negligent actions of those involved.

169.   By Defendant David Ballard telling his officers that Quilliams II unit is placed under Martial Law and letting his officers use chemical agents on the inmates for simple rule violations and not investigating all the complaints and grievances from inmates in the Quilliams II unit and encouraging his officers to use chemical agents as a first step instead of following the less lethal use of force or trying to temper the situation, he has violated plaintiff's rights under the Eighth Amendment to the United States Constitution and causing plaintiff pain, suffering, emotional distress, severe emotional distress, and physical injury.

170.   At this facility, Mount Olive Correctional Complex, superiors or supervisors allow subordinates to:   (1) use chemical agents on inmates or use excessive force for refusing orders that are simple rules violations and are not detrimental to the safety and security of the institution or to maintain and restore order; (2) use no efforts to temper before the use of force on segregated inmates locked securely in their cells; (3) violate policies and procedures such as but not limited to the less-lethal use of force policy and calculated use of force policy; (4) ignore inmates cries and pleas for help from mental health; and (5) allows staff to talk and treat inmates any way they see fit.

(*Id.*, ¶¶ 167-170).   The plaintiff further alleges that the defendants, and Ballard and Rubenstein in particular, have had knowledge of the pervasive, long-standing and documented excessive use of force and inadequate mental health care against inmates since at least January of 2009, and have not fixed or addressed this misconduct.   The

plaintiff further alleges that the failure of the supervisory defendants to address the misconduct of their subordinates amounts to approval or tacit authorization of the misconduct.   (*Id.*, ¶¶ 173-174).

Specifically concerning the conduct of defendants Ballard and Rubenstein, the plaintiff's Complaint also alleges as follows:

> 182. By defendant Ballard telling his officers that Quilliams II unit is placed under Martial Law and letting his officers use chemical agents on inmates for simple rules violations and not investigating the complaints and grievances and not encouraging his officers to follow policy or try to temper the situation, he has violated plaintiff's rights under the Eighth Amendment to the United States Constitution and causing plaintiff pain, suffering, emotional distress, severe emotional distress, and physical injury.

> 183. By defendant Jim Rubenstein not investigating all the letters, complaints and grievances appealed to him all the way from 2009 about the excessive use of force claims and inadequate physical and mental health care, he has violated plaintiff's rights under the Eighth Amendment to the United States Constitution and causing plaintiff pain, suffering, emotional distress, severe emotional distress and physical injury.

(*Id.*, ¶¶ 182-183).

The plaintiff seeks a declaration that the defendants violated his constitutional rights, as well as compensatory and punitive damages.   The plaintiff also seeks various forms of injunctive relief and compensatory and punitive damages.   (*Id.*, ¶¶ 189-204).

## STANDARD OF REVIEW

The defendants' motion asserts that the plaintiff's Amended Complaint fails to state a claim upon which relief can be granted against all of the defendants in their official capacities and against defendants Ballard and Rubenstein in their individual capacities.   In *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme

Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true, and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."   While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."   *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case.   The Court wrote:

> Two working principles underlie our decision in *Twombly*.   First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).   Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.   Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.   *Id.*, at 556. * * *
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.   When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. at 678-79.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."   *Id.* at 678.

The Supervisory Defendants' motion will be reviewed under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the *Twombly/Iqbal* standard.   Furthermore, as

noted recently in *Haley v. Virginia Dep't of Health*, 4:12-cv-0016, 2012 WL 5494306, at *2 n.2 (W.D. Va.  Nov. 13, 2012), "[t]he Fourth Circuit has not resolved whether a motion to dismiss based on the Eleventh Amendment is properly considered pursuant to Rule 12(b)(1) or Rule 12(b)(6) . . . The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1) [which provides for the dismissal of claims over which the court lacks subject matter jurisdiction]."

## ANALYSIS

### A.    Official capacity claims.

The defendants' Motion to Dismiss (ECF No. 17) and Memorandum of Law (ECF No. 18) assert that, to the extent that the plaintiff has brought claims against all of the defendants in their official capacities, any claims for monetary damages cannot survive because, neither a state, nor its officials acting in their official capacities, are "persons" under the civil rights statutes.   In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989), the Supreme Court stated:

> Obviously, state officials literally are persons.   But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.   As such, it is no different from a suit against the State itself.   We see no reason to adopt a different rule in the present context, particularly when such a rule would allow petitioner to circumvent congressional intent by a mere pleading device.

> We hold that neither a State nor its officials acting in their official capacities are "persons" under § 1983.   The judgment of the Michigan Supreme Court is affirmed.   [Citations omitted].

Furthermore, pursuant to the Eleventh Amendment to the United States Constitution, the power of the federal judiciary does not extend to suits by a citizen of one state against another, or to suits by a citizen against his or her own state.   *Hans v.*

*Louisiana*, 134 U.S. 1, 9 (1980).   Thus, the Eleventh Amendment of the United States Constitution bars a suit in a federal court by private parties seeking to impose monetary liability upon a State or State officials, which may be paid from public funds in the state treasury.   *Quern v. Jordan*, 440 U.S. 332, 337 (1979).   Absent consent, federal suits against a state by a citizen of that state or another state are prohibited by the Eleventh Amendment.   *Kentucky v. Graham*, 473 U.S. 159, 199 (1985); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99-100 (1984).   The Eleventh Amendment, however, permits a federal court to enjoin state officials to conform their future conduct to federal law, which is distinguishable from a retroactive monetary award paid from State funds.   *Id.* at 337.   Thus, the undersigned proposes that the presiding District Judge **FIND** that the DOC Defendants are immune from liability for monetary damages in their official capacities under the Eleventh Amendment and, accordingly, such claims must be dismissed.

> **B.    Individual capacity claims.**

The seminal issue in this case is whether the defendants' conduct violated the plaintiff's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment of the United States Constitution.   In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"   This is a low standard.   The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'"   *Id.* at 833.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.   The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."   503 U.S. at 6.   The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.   The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."   *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).   Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."   *Id.* at 322.

In *Whitley*, the Court set forth the following five factors that must be weighed in determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm:   (1) the need for application of force; (2) the relationship between the need and

12

the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response.   *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996).   (ECF No. 104 at 13).   This is clearly-established law of which a reasonable correctional officer or prison administrator would know, and is the measure by which the conduct of the officers alleged to have used force against the plaintiff will be judged.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Court held that supervisors may be liable for the actions of their subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations.   Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."   13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)).   In *Shaw*, the Fourth Circuit discussed the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

1)   The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

2)   The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and

3)   There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

13

13 F.3d at 799. However, in *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court clarified that a prison official's "actual subjective awareness" of an excessive risk of harm or safety was required to hold the official liable under the Eighth Amendment. Thus, a prison official cannot be held liable for the failure to alleviate a risk that he should have perceived, but did not in fact perceive. *Id.* at 838.

*The DOC Defendants' Memorandum of Law*

The DOC Defendants' Memorandum of Law addresses the *Shaw* elements in relation to the plaintiff's claims against defendants Ballard and Rubenstein ("the Supervisory Defendants"). (ECF No. 18 at 5-7). The Memorandum of Law asserts that the plaintiff has not alleged, and cannot establish, that either of these supervisors had actual knowledge of "a pervasive and unreasonable risk" of constitutional injury to the plaintiff. (*Id.*) The Supervisory Defendants further assert that, while the second element concerning "deliberate indifference or tacit authorization of the alleged offensive practices" may be demonstrated by "continued inaction in the face of documented widespread abuses," *Shaw*, 13 F.3d at 799, the plaintiff herein has pled only conclusory allegations that amount to no more than a recital of the legal elements of a supervisory liability claim. (*Id.* at 7-8).

The DOC Defendants also assert that they cannot be held liable for the plaintiff's claims of alleged negligence or deficient care by the medical and mental health providers as they are permitted to rely upon the professional judgment of trained medical personnel. (ECF No. 18 at 8-9). Their Memorandum of Law states that "the Complaint clearly demonstrates that the Plaintiff was provided access to mental health care. In fact, the Complaint clearly demonstrates that the Plaintiff rejected mental health care

services when medical attempted to render the same.   *See Plaintiff's Complaint, 11-130."*   (*Id.*)

*The plaintiff's Response*

On August 5, 2014, the petitioner filed a Response in Opposition to the Supervisory Defendants' Motion to Dismiss (ECF No. 21).   The plaintiff's Response first asserts that the defendants' motion is premature and that he needs an adequate opportunity to conduct discovery.   (*Id.* at 3).   The plaintiff further asserts that the factual allegations in his Complaint demonstrate that he was seeking assistance and "his pleas fell on ears deafened by callousness."   (*Id.* at 5).   His Response further states:

> This callousness (it's important to note) was born out of the hearts and minds of the two aforementioned defendants "Rubenstein and Ballard," the two policy-makers, who issued orders to their subordinates: "<u>We no longer have to give efforts to temper to those locked up in our Seg. Units</u>" thereby sanctioning the violation of Eighth Amendment rights and prohibitions against cruel and unusual punishments and deprivation of human necessities.   And a blanket declaration of "<u>Martial Law.</u>"   (Both of which are evidenced by exhibits).

(*Id.*)   The plaintiff further asserts that his continued pleas for help were met with threats of violence and intimidation.   (*Id.* at 6).   When no assistance was provided, the plaintiff acknowledges that he flooded his cell; however, he further asserts that, at the time he was pepper sprayed, he was no longer flooding or capable of flooding, as the water had been shut off nearly 30 minutes earlier.   (*Id.* at 6-7).

The plaintiff's Response largely repeats each factual allegation made in his Complaint.   (*Id.* at 6-23).   Concerning the conduct of defendants Ballard and Rubenstein, the plaintiff's Response specifically asserts:

> The Defendants Rubenstein and Ballard acted with a culpable state of mind when they as chief policy-makers and supervisors promulgated unlawful

15

and unconstitutional directives, policies and procedures "knowingly" that violated Eighth Amendment prohibitions against cruel and unusual punishments, i.e. "excessive use of force," entitled "<u>Martial Law</u>" and advising all staff:   "<u>We do not have to give efforts to 'temper' to those locked up in our Seg. Units</u>" thereby "authorizing" unfettered use and application of force with no need to temper.   They knew or should have known that these actions and conduct were unlawful, unconstitutional and created a pervasive and unreasonable risk of serious and severe injury to all inmates; and did result in and cause the Plaintiff's injuries of which were substantial and documented by Medical Staff as "First Degree Chemical Burns" to his face, arms, chest, hands, legs, feet and his genitals . . . "<u>all</u>" caused by the Defendants' authorizing their subordinates to inflict any arbitrary amount of force they so desired.

(*Id.* at 26-27).   The plaintiff's Response further contends that Ballard and Rubenstein failed in their duties to enforce WVDOC and MOCC policies, procedures and rules concerning use of force, and also concerning the handling of inmates who may be exhibiting suicidal behavior.   (*Id.* at 30-41).

In support of the latter claims, the plaintiff's Response cites to particular operational procedures (O.P. ## 3.30 and 4.47) concerning mental health services and suicide precautions, which, he contends, require the transfer of inmates exhibiting suicidal behavior to the medical or mental health unit, after consultation of the Segregation or Shift Commander with the Director of Mental Health and the Inmate Movement Coordinator.   (*Id.* at 32-33).   After a brief discussion of the standard for deliberate indifference to a serious medical need, and a recitation of the plaintiff's specific factual allegations concerning the failure of the mental health staff (who have not presently filed a motion to dismiss) to provide him with timely and adequate mental health treatment, the plaintiff's Response contends that defendants Ballard and Rubenstein were made aware of this lack of treatment through grievances and failed to

take any measures to address the problem, and ensure that the plaintiff received needed care.   (*Id.* at 33-41).

*The DOC Defendants' Reply*

The DOC Defendants' Reply reiterates their position that the plaintiff's allegations concerning the conduct of defendants Ballard and Rubenstein do not rise to the level of deliberate indifference, and that the plaintiff has not sufficiently alleged facts to support a finding that Ballard and Rubenstein "knew that the policies at stake were unlawful and unconstitutional."   Their Reply states:

> There is no dispute that Defendants Warden [sic; Rubenstein] and Ballard have a general duty to provide a safe environment for Plaintiff, other inmates, as well as the employees.   However, this general duty as alleged by Plaintiff (or lack thereof), without more on the part of Defendants Ballard and Rubenstein, does not rise to deliberate indifference.   Were that the case, Defendants Ballard and Rubenstein would be liable for every act or omission of every correctional officer or employees supervised by them . . . .

> Next Plaintiff argues that Defendants Rubenstein and Ballard acted with a culpable state of mind when they as chief policy makers and supervisors promulgated unlawful and unconstitutional directives, policies and procedures knowing that they violated the Eighth Amendment prohibitions against cruel and unusual punishments, i.e. "excessive use of force," entitled "Martial Law" and advising all staff that "We do not have to give efforts to temper to those locked up in our seg units" . . . .   *See Compl.* at 25-26.   Plaintiff's allegations are baseless, and conclusory at best. Plaintiff claims that Defendants Ballard and Rubenstein knowingly promulgated unconstitutional directives, policies and procedures. However, Plaintiff has not provided any evidence demonstrating how both Defendants knew that the policies at stake were unlawful and unconstitutional.   Importantly, there is no evidence demonstrating a prior finding that the policies and procedures at stake are unlawful and unconstitutional, aside from Plaintiff's self-serving statements regarding the same.

(ECF No. 22 at 3-4).

*The plaintiff's Sur-Reply*

On August 26, 2014, the plaintiff filed a Sur-Reply, without leave of court.   (ECF No. 24).   By prior Order (ECF No. 33), the undersigned denied a Motion to Strike the Sur-Reply, and the undersigned will address the Sur-Reply herein, so that the presiding District Judge may decide whether to consider it in his analysis of the pending Motion to Dismiss.

The Sur-Reply (ECF No. 24 at 7-10) cites, *inter alia*, to the first factor in *Hudson*, 503 U.S. at 7, which states that, in determining whether a particular use of force is excessive, courts must initially consider "the need for the application of force."   In the instant case, the plaintiff asserts that there was no need for the force used at the time it was implemented because he was no longer flooding his cell or acting out in any way.

The plaintiff also cites to the Fourth Circuit's decision in *Slakan v. Porter,* 737 F.2d 368 (4th Cir. 1984), in which the Court upheld a finding of excessive use of force when tear gas, water hoses and a billy club were used against an inmate who, though locked in his isolation cell, was exhibiting disruptive behavior, including spewing obscenities at correctional officers and reaching through the bars of his cell door to hit an officer.   The Court held that, while such behavior warranted disciplinary action, "[t]he prisoner was locked in a one-man cell at the time of the incident and posed no direct physical threat to other inmates or any of the guards" and the use of such force "unquestionably crossed the line separating necessary force from brutality."   *Id.* at 372. The Court also held that the evidence in *Slakan* was sufficient to establish supervisory liability against the Warden, the Director of Prisons and the Secretary of Corrections,

and that those defendants were not entitled to qualified immunity. *Id.* at 373-377. The

*Slakan* Court specifically stated:

> Nor can these officials seriously argue that the application of eighth amendment liability to their actions represents a novel or unanticipated development in the jurisprudence governing § 1983 actions. . . . Whether or not these officials were actually aware of their constitutional and statutory obligations, they are presumed to know what the law requires, and may be legally accountable for conduct that violates fixed standards.

*Id.* at 377.

The plaintiff contends that the same holds true in this case. His Sur-Reply

contends that:

> In declaring martial law, defendants Ballard and Rubenstein had instructed officers that they do not have to comply with official policies and procedures that typically govern uses of force when dealing with inmates in solitary confinement. In addition, they clearly directed officers that they are not required to make efforts to temper the severity of the force used on these inmates. ("efforts to temper not needed or required.") *See* Exhibit # 35, Grievance No. 12-MOCC-Q2-985, signed by Captain R. Matheny, Warden David Ballard and WVDOC Commissioner Jim Rubenstein. This directive contradicts clear United States Supreme Court law regarding the use of excessive force. . . . In determining whether prison official's use of force was done maliciously and sadistically, four factors must be evaluated: "the need for the application of force, the relationship between the need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and any efforts made to temper the severity of a forceful response." [Hudson, 503 U.S.] at 7, citing *Whitley v. Albers*, 475 U.S. 312, 321 (1986) (emphasis added). By instructing officers on the isolation units that "[w]e do not have to give efforts to temper to those locked up in our Seg units," the defendants Ballard and Rubenstein are knowingly and willingly instructing officers to act in a manner that is contrary to the Eighth Amendment.

> Defendants' implementation of "Martial Law" and their (Ballard and Rubenstein) "protocol" not to make efforts to temper the severity of force used on segregated inmates has directly resulted in a pattern and practice of using excessive force on inmates housed in the segregation units. The use of force occurs in two manners: (1) when the use of force is unnecessary altogether, i.e., using force when the inmate poses no imminent and present danger of harm to others, himself or property, *see*

> *Harrah*, 165 W. Va. 665, 271 S.E.2d 322, at Syl. Pt. 3; and (2) the amount of
> force used exceeds what is necessary in a given situation because the
> severity of the force used was not tempered.   *See Hudson*, 503 U.S. at 7.
> In both of these circumstances, the referenced defendants are violating
> their clear legal duty under the federal and state constitutions to ensure
> that the plaintiff and other segregated inmates are not subject to crule [sic;
> cruel] and unusual punishment, and <u>exhibit # 35</u> clearly indicates and
> establishes this violation has been on-going since August 18, 2012.

(ECF No. 24 at 7-8).

In *Shaw v. Stroud,* the Fourth Circuit held that "liability is ultimately determined
by pinpointing the person/persons in the decision making chain whose deliberate
indifference permitted the constitutional abuses to continue unchecked."  13 F.3d at
799.  Taking the plaintiff's allegations as true, the undersigned proposes that the
presiding District Judge **FIND** that the plaintiff has alleged specific facts that would
allow the court to draw a reasonable inference that the conduct of defendants Ballard
and Rubenstein violated the plaintiff's constitutional rights through the promulgation,
implementation and/or continued enforcement of a policy or procedure that exposes
inmates to excessive and unnecessary uses of force when such use of force was not
justified under the circumstances, and was for malicious or sadistic purposes, rather
than simply to restore order.

Accordingly, the undersigned proposes that the presiding District Judge **FIND**
that the allegations in the Complaint concerning the use of force against the plaintiff
state plausible claims of violations of his rights under the Eighth Amendment of the
United States Constitution, and those allegations further sufficiently support claims of
supervisory liability against defendants Rubenstein and Ballard on that basis.
Furthermore, the undersigned proposes that the presiding District Judge **FIND** that,

based upon those allegations, it is premature to make a finding of whether Ballard and Rubenstein are entitled to qualified immunity, and that the parties should be permitted to engage in discovery and further proceedings on those issues.

However, to the extent that the plaintiff has also attempted to allege claims against defendants Ballard and Rubenstein concerning deliberate indifference to the plaintiff's mental health needs, the undersigned proposes that the presiding District Judge **FIND** that, even viewing those allegations in the complaint as true, and in the light most favorable to the plaintiff, the Complaint does not contain "enough facts to state a claim to relief that is plausible on its face." The factual allegations concerning the conduct of defendants Ballard and Rubenstein with respect to the plaintiff's receipt of mental health care are threadbare, conclusory and largely appear to be extrapolated from the allegations against those defendants concerning the use of force, and the allegations of deliberate indifference levied against the mental health staff itself. Such allegations against defendants Ballard and Rubenstein do not satisfy the standards set forth in *Twombly* and *Iqbal* and, therefore, warrant dismissal under Rule 12(b)(6).

## RECOMMENDATION

Based upon the proposed findings contained herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion to Dismiss filed by the DOC Defendants (Ballard, Rubenstein, Hypes and Hahn) (ECF No. 17) with respect to the plaintiff's claims for monetary damages against all of those defendants in their official capacities, and with respect to the plaintiff's Eighth Amendment claims against defendants Ballard and Rubenstein concerning deliberate indifference to his mental health treatment. It is further respectfully **RECOMMENDED** that the presiding

21

District Judge otherwise **DENY** that Motion to Dismiss.   It is further respectfully **RECOMMENDED** that the presiding District Judge leave this matter referred to the undersigned Magistrate Judge for additional proceedings concerning the plaintiff's remaining claims.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.   Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).   Copies of such objections shall be provided to the opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the plaintiff and to transmit a copy to counsel of record.

January 23, 2015

Dwane L. Tinsley
United States Magistrate Judge