## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON

**ROGER DWAYNE SMITH,**

        **Plaintiff,**

**v.**                      **Case No. 2:14-cv-17001**

**JOSHUA HYPES, Correctional Officer,**
**DANIEL HAHN, Correctional Officer,**
**DAVID BALLARD, Warden,**
**Mount Olive Correctional Complex,**
**JIM RUBENSTEIN, Commissioner,**
**West Virginia Division of Corrections,**
**each in their individual and official capacities,**

        **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court is a Motion for Summary Judgment filed by defendants Hypes, Hahn, Ballard and Rubenstein (hereinafter collectively referred to as the "DOC Defendants"). (ECF No. 119).[1]

## RELEVANT PROCEDURAL HISTORY

The plaintiff Roger Dwayne Smith ("Smith") is an inmate serving a sentence of life without mercy after his conviction for murder and several other felony offenses. Smith

---

[1] On January 31, 2017, the presiding District Judge granted the unopposed Motion for Summary Judgment of Shanna Coleman, Meredith Smith and Sherrill Snyder. (ECF No. 150).

has been in custody at the Mount Olive Correctional Complex ("MOCC") since March 16, 2007.   (ECF No. 143-1 at 3, pp. 6:23-24 and 7:1).[2]   Smith acknowledged in his deposition that, during his period of incarceration, he has engaged in behavior, including assaults, possessing contraband, refusing orders, obstruction, sex acts and gambling, which has led to his placement in segregation several different times.   (*Id.* at 6-7, p. 22:16-24; p. 24:10-15 and pp. 24-27).

On May 27, 2014, Smith filed a verified Complaint (ECF No. 1) concerning a use of force that occurred on the Quilliams segregation unit at MOCC on September 1, 2013. Smith alleges that, after repeatedly asking for and being denied mental health assistance over several weeks, he and another inmate on his pod began flooding their cells in order to get assistance.   Smith further alleges that, after the water to his cell was turned off, defendant Daniel Hahn sprayed him with Oleoresin Capsicum ("OC" or "pepper spray"), while defendant Joshua Hypes did nothing to intervene and stop Hahn, in violation of Smith's Eighth Amendment rights.

Smith further alleges that defendants David Ballard and Jim Rubenstein (hereinafter "the Supervisory Defendants") had been put on notice of the widespread use of excessive force by correctional officers at MOCC through numerous grievances and lawsuits filed by inmates who have been subjected to this conduct, and that Ballard has actually encouraged this conduct through the implementation of a policy known at the prison as "Martial Law" (or "No Efforts to Temper in Segregation").   Smith further

---

2   Smith has offered the complete transcript of his deposition as an exhibit to his Response to the DOC Defendants' Motion for Summary Judgment.   Because his version of the deposition is a condensed version with four pages on each full size page, when citing to the deposition, the undersigned will use the court's Case Management/Electronic Case File ("ECF") page number, followed by the deposition page number and then the line numbers.

alleges that Ballard and Rubenstein have ignored the issue and have failed to take any action against the offending officers.

On March 28, 2016, following a period for discovery, the DOC Defendants filed a Motion for Summary Judgment, with exhibits (ECF No. 119), and a Memorandum of Law in support thereof (ECF No. 120).   The exhibits offered by the DOC Defendants consist of the following: (A) excerpts from Smith's deposition on February 18, 2016; (B) a Memorandum from Lieutenant Daniel Hahn to Major Robert Rhodes, dated September 1, 2013, summarizing the use of force against Smith on that date; (C) an incident report completed by Joshua Hypes on September 1, 2013; (D) an incident report completed by Nicholas Boychuck on September 1, 2013; and (E) an Affidavit of Warden David Ballard executed on November 10, 2015.   (ECF No. 119-1, Exs. A-D).   The DOC Defendants' Motion and Memorandum assert that they are entitled to judgment as a matter of law because: (1) the record demonstrates that Joshua Hypes was not present during the use of force complained of by Smith; (2) Daniel Hahn used force against Smith in a good faith effort to restore order; (3) Smith has failed to offer sufficient evidence to support his claims against David Ballard and Jim Rubenstein; and (4) the DOC Defendants are entitled to qualified immunity on Smith's claims against them.

Pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Smith was previously advised of his right and obligation to respond to any motion for summary judgment filed by the defendants.   (ECF No. 92).   On June 9, 2015, Smith filed a "Response in Opposition to Defendant Hypes, Hahn, Ballard and Rubenstein's Motion for Summary Judgment" (ECF No. 142) and a "Memorandum of Law in Opposition to Defendant Hypes, Hahn, Ballard and Rubenstein's Motion for Summary Judgment" (ECF

3

No. 143), with the following exhibits: (1) the complete transcript of Smith's February 18, 2016 deposition; (2) Smith's affidavit executed on June 8, 2016; (3) a declaration of inmate Douglas Ganoe; (4) an affidavit of inmate Fred D. Douty; (5) a declaration of inmate Keith W.R. Lowe; (6) excerpts from Smith's medical records between September 1, 2013 and September 14, 2013; (7) the Defendants' Answers to Plaintiff's First Set of Interrogatories and Responses to Plaintiff's Second Request for Production of Documents in the separate matter of *Douty v. Rubenstein*, Case No. 2:13-cv-32832; (8) a Unit Team Request Form completed by Smith on August 26, 2013; (9) an audio recording of inmate James Mullins' disciplinary hearing in Docket No. MOC-13-0925-G, dated September 16, 2013 (which was produced to the court *in camera* and will be ordered filed under seal by separate Order); (10) an e-mail from Robert Rhodes to various correctional staff dated September 9, 2013, titled "protocol;" (11) an inmate grievance filed by inmate Fred Douty on April 29, 2014; (12) an inmate grievance filed by inmate Casey Rygh on August 18, 2012; (13) directions for use of "Phantom OC by Sabre;" and (14) a video of Smith's decontamination on September 1, 2013 (a copy of which has been hand-delivered to the undersigned and will be ordered to be filed under seal by separate Order).   (ECF No. 143-1).[3]   The DOC Defendants did not file a Reply brief.   This matter is ripe for adjudication.

---

[3]   Smith's exhibits (which have been docketed as "Attachments and Exhibits") are not numbered in a logical manner and some contain exhibit numbers from other filings, including the attachments to the plaintiff's Complaint.   Accordingly, for the purpose of this Proposed Findings and Recommendation, the undersigned will use the numbers set forth above when referring to the exhibits attached to the plaintiff's Response.

## **STANDARD OF REVIEW**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010). Material facts are those necessary to establish the elements of a party's cause of action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. *Id.* The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Kentucky Cent. Life Ins.* Co., 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

> A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).   Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:   (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.   Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence or make determinations of credibility.   *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).   Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.   *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).   Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."   *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).   However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.   *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## <u>ANALYSIS</u>

The central issue in this case is whether the defendants' conduct violated the plaintiff's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment of the United States Constitution.   In *Farmer v. Brennan*, 511 U.S. 825, 832

(1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"   This is a low standard.   The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833.

"An inmate's Eighth Amendment claim involves a subjective component and an objective component."   *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008); *see also Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) ("Determination of whether the Eighth Amendment has been violated requires analysis of subjective and objective components.") (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991))).   "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams*, 77 F.3d at 761.

### A.     Smith's Eighth Amendment claim against Hahn.

Smith asserts that defendant Hahn used excessive force when he deployed pepper spray into Smith's cell on September 1, 2013.   Because Smith's other claims are dependent upon a determination of whether Hahn's conduct violated his Eighth Amendment rights, the undersigned will first address the claim against Hahn.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.   "The objective component focuses

not on the severity of any injuries inflicted, but rather on 'the nature of the force' which must be 'nontrivial.'" *Tedder v. Johnson*, 527 F. App'x 269, 272 (4th Cir. 2013) (quoting *Wilkins v. Gaddy*, 559 U.S. 34 (2010)).

Considering the objective component first, although the DOC Defendants contend that Smith did not suffer any serious injury from the deployment of OC spray, they do not appear to dispute that OC spray can cause severe adverse effects, and "courts have previously found that similar adverse physical reactions to pepper spray and other chemical munitions were sufficient to create a genuine issue of material fact as to the objective inquiry of an excessive force claim." *Harper v. Blagg*, No. 2:13-cv-19796, 2015 WL 6509131, *12 (S.D. W.Va. Oct. 28, 2015); *see also Tedder*, 527 F. App'x at 274 ("Tedder's adverse physical reaction to the pepper spray – gagging, breathing difficulty, and vomiting – established that the nature of the force Sgt. Johnson used against Tedder was nontrivial."); *Blount v. Collins*, No. 7:12CV476, 2013 WL 4084764 at *4 (W.D. Va. Aug. 13, 2013) (breathing problems, chest pain, and painful burning sensation to eyes, nose and skin that lasted for some time after decontamination following deployment of pepper spray was sufficient to present genuine issue of material fact on objective component of excessive force claim).

Smith's verified Complaint alleges that he "was in an excessive amount of pain and couldn't breath[e] and was really panic[k]ing." (ECF No. 1 at 9, ¶ 39). He further alleges that he continued to have pain in his private area, body and face throughout the decontamination process, and claims that such pain was exacerbated by a shower with water that was too hot. (*Id.* at 10-12, ¶¶ 48, 55-63). Smith further alleges that he further suffered burning and severe pain in his hands and feet because chemicals remained in his

8

cell and on his belongings. (*Id.* at 13, ¶ 68). Smith alleges that he was still in pain for days after this incident and was ultimately diagnosed with first degree burns from the pepper spray. (*Id.* at 15, ¶¶ 75-78 and Ex. 4).

During his deposition, Smith testified about the first degree burns he suffered to his arms, chest, face and stomach, and contended that he still has scars therefrom. (ECF No. 143-1 at 10:38:7-20). These assertions are further supported by Smith's Affidavit (ECF No. 143-1 at 43, ¶¶ 33-35) and his medical records, which indicate that Smith continued to complain of burning skin, which was peeling and showed blisters (ECF No. 143-1 at 51-52). Taking this evidence in the light most favorable to Smith, there is evidence from which an inference can be drawn that the force used against Smith was "non-trivial" and there is, at least, a genuine issue of material fact as to whether Smith can establish the objective component of an Eighth Amendment claim.

Turning to the subjective component, the Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6. The *Whitley* Court noted that:

> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320. The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547). Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury." *Id.* at 322.

In *Whitley*, the Court set forth the following factors that must be weighed in determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm: (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response. *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996). The parties' briefs address these factors with respect to Hahn's conduct.

The DOC Defendants contend that, under the circumstances, Hahn used the pepper spray in a good faith effort to restore order in the prison unit. Their Memorandum of Law states:

> Here, it is clear that the Plaintiff had intentionally created a disturbance in Quilliams that had spread to additional pods in Quilliams[4] by flooding his cell and the pod. Plaintiff, an inmate convicted of a violent crime with a long history of violent offenses within West Virginia Division of Corrections' institutions, was housed in the segregation unit of a maximum security prison. Per policy, officers may not simply open a cell door and speak with an inmate or pull him away from his toilet. Rather, prior to officers opening the door, the inmate must cooperate in the strip out process.

---

4 The undersigned notes that no specific evidence has been offered to indicate that disturbances had spread to additional pods in the Quilliams units.

> Because Lt. Hahn could not open the door, many of the soft tactics were not
> viable options.   Without opening the door, Lt. Hahn could not apply a
> pressure point, a join lock or a K9.   Without the willing cooperation of the
> Plaintiff, Lt. Hahn could not apply mechanical restraints.   The only
> remaining options itemized on the Use of Force Model for the level of
> resistance offered by the Plaintiff were the use of a Tazer [sic; Taser], the
> use of a Pepper Ball or a 12g/37 mm Specialty Impact.   As a result, the need
> for the use of OC is clear.

(ECF No. 120 at 8-9).   Thus, the DOC Defendants contend that Smith's behavior at the

time he was sprayed justified that action, and that the first *Whitley* factor weighs in favor

of the defense.   (*Id.*)

Similarly, the DOC Defendants contend that the second *Whitley* factor examining

the relationship between the need for force and the amount of force used also weighs in

their favor because Hahn only used that force which was reasonably necessary to gain

Smith's compliance.   (*Id.* at 9).   They further contend that the United States Court of

Appeals for the Fourth Circuit has recognized that "the use of mace on an unruly or

'recalcitrant' prison inmate, though confined in his cell, is not plainly *per se*

unconstitutional."   *Bailey v. Turner*, 736 F.2d 963, 970 (4th Cir. 1984); *see also Williams

v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996) (acknowledging that chemical agents used

in limited or small quantities to control a recalcitrant inmate may be constitutional and

more humane than a face to face confrontation) (other citations omitted).   (*Id.* at 9-10).

Their Memorandum of Law further states:

> In the instant matter, the situation at hand was simply not a single inmate
> causing a disturbance.   Rather, by the Plaintiff's own testimony, he and
> another inmate began flooding their cells.   Flooding not only creates a
> hazard for officers who need to maintain control over the inmate
> population, but also poses an immediate threat to the drainage system as a
> whole, which could affect every inmate in the Quilliams units.

11

(*Id.* at 10).   The DOC Defendants make a similar argument with respect to the fourth *Whitley* factor – the threat reasonably perceived by the defendants – asserting that Smith acknowledged that he "assisted in creating a disturbance in a highly volatile environment." (*Id.* at 10-11).   They further assert:

> Again, the Plaintiff was in a segregation unit of Mount Olive that required the Plaintiff to cooperate and comply with the strip out process prior to the cell door being opened.   Plaintiff is serving a sentence related to a violent felony, has been convicted of multiple assaults, has refused orders, committed obstruction, and sex acts during his time under the control of the West Virginia Division of Corrections.   Given the Plaintiff's history, Lt. Hahn had good reason to approach Plaintiff with care and good reason to expect that Plaintiff would likely not readily heed their orders, especially given the chaos present in the Pod and Unit generally.

(*Id.* at 11).

The DOC Defendants further contend that Smith is unable to satisfy the third *Whitley* factor because he cannot demonstrate that he suffered anything more than temporary irritation and possible swelling from the pepper spray, and he did not require medical treatment.   (*Id.*)   Finally, with respect to the fifth *Whitley* factor, the DOC Defendants contend that Hahn tempered his response to Smith's conduct because he could have employed more invasive or painful measures, but chose to deploy the least amount of force available via two one-second bursts of pepper spray.   (*Id.*)

The DOC Defendants contend that Smith was still flooding his cell when Hahn made the decision to pepper spray him.[5]   In support of this contention, they offer a

---

5   The DOC Defendants attempt to equate the instant case to that of *Harper v. Ballard*, Case No. 2:12-cv-00656 (S. D. W. Va., Mar. 21, 2014), in which the Honorable Thomas E. Johnston granted summary judgment to an officer who deployed pepper spray into an inmate's segregation cell because he was flooding his cell and allegedly ignored orders to stop doing so.   However, the instant case is arguably distinguishable from *Harper* because Harper admitted that he was actively flooding his cell at the time he was sprayed.   In the instant case, there is at least a genuine issue of material fact as to whether Smith was actively flooding

Memorandum prepared by Hahn summarizing the incident, which states in pertinent part as follows:

> At approximately 2254 hours Correctional Officer Two Nicholas Boychuck and myself were assisting other Officers in the decontamination of Inmate Ramsey, Samuel DOC #490810 on the Recreation Yard when we were notified via Unit radio that Inmate Smith, Roger DOC # 44876 in Cell # 413 was flooding his cell and Pod # 4.   After responding to Pod # 4, we observed water flowing under the door of Cell # 413.   COII Boychuck opened the food tray slot door and I deployed two one second bursts of Oleoresin Capsicum from a Unit issued Mark IX serial # 2322620 to the area of Inmate Smith's eyes, nose, and forehead.   The flooding stopped.   The food tray door was closed and we departed the Pod.

(ECF No. 119, Ex. B).   Likewise, an incident report prepared by Nicholas Boychuck indicates that "[a]t approximately 2256 . . . Inmate Smith was engaged in actively flooding his cell.   Inmate Smith ignored multiple loud verbal commands to stop flooding his cell." (*Id.*, Ex. D).

Conversely, Smith's verified Complaint and other evidence contends that he was not actively flooding at the time he was pepper sprayed and contends that the water to his cell had been turned off some 10-20 minutes before. (ECF No. 143-1 at 10, p. 38:3-6).   He further denies being given any loud verbal commands and states, "My water wasn't turned on so I was no longer flooding."   (*Id.*)   Smith's affidavit and the affidavits or declarations of other inmates on the pod support his contention.   Smith's affidavit states:

> After 15-20 minutes inmate Ramsey and myself stopped flooding our toilets the Defendant[s] responded. Defendant[s] Hahn and Hypes along with officer[s] Chris Hess, Joe Wimmer, Nicholas Boychuck and Hudson entered pod 4 going directly to mine and inmate Ramsey's utility closets shutting off both water supplies making both the toilet and sink inoperable. Hence, stopping the disturbance and restoring order within the unit and facility.

---

or had ceased doing so up to 20 minutes prior to being sprayed.   Thus, the undersigned does not believe that *Harper* should be persuasive in the instant matter.

13

* * *

> When Defendant Hahn sprayed me it had been 10-20 minutes after the
> water supply had been shut off to my cell.   Therefore the situation had been
> brought under control and the good order in the unit had been restored and
> maintained because on [sic; no?] other inmates joined in or continued to
> create a disturbance.

(ECF No. 143-1 at 42, ¶¶ 23, 27).   The affidavit of Fred Douty also suggests that Smith

was sprayed "after shutting off his water."   (ECF No. 143 at 46, ¶ 9).

Smith's Response to the DOC Defendants' Motion for Summary Judgment further

contends:

> Before Hahn sprayed Smith with an excessive amount of OC spray no verbal
> commands or warnings were given instructing him to cuff up or that any
> spray would be used.   (Smith Aff. ¶ 24).   Hahn sprayed Smith in the face,
> abdomen and genitals.   At the time Smith was only wearing a pair of boxer
> shorts.   All other areas were directly exposed to the chemicals.   Had any
> verbal commands been given for Smith to cuff up and be taken out of the
> cell he would have complied.   (Smith Aff. ¶ 26).   Approximately 10-20
> minutes had passed when Smith's water supply had been shut off at the time
> Hahn deployed OC spray into the cell.   The situation had been brought
> under control and good order of the unit had been restored and maintained
> because no other inmates joined in or continued to create a disturbance.
> Accordingly, Hahn and Hypes could not have reasonably perceived ant [sic;
> any] threats to the institution.   (Smith Aff. ¶ 27; Douty Aff. ¶ 9; Lowe Aff. ¶
> 5).   Hahn's use of OC spray against Smith was in an amount exceeding the
> manufacturer's instructions and at closer distances than the manufacture[r]
> directs.[6]   (Smith Aff. ¶ 28).

(ECF No. 143 at 6).

Consequently, under the totality of the circumstances, the undersigned proposes

that the presiding District Judge **FIND** that there is a genuine issue of material fact

---

6  In further support of this contention, Smith has produced what appears to be a label from a can of
"Phantom OC by Sabre," which contains directions including, "When used indoors, do NOT use more than
two (2) deployments.   Both deployments should be no longer than three (3) seconds in duration for a
maximum of six (6) seconds."   (ECF No. 143-1 at 74 (Ex. 13 [listed by Plaintiff as Ex. 7])   The directions
further state, "Do not discharge at distances less than 6 feet – may cause injuries to soft body tissue."   (*Id.*)

14

concerning whether Smith was actively flooding his cell at the time he was pepper sprayed and, whether Hahn deployed pepper spray in a good faith effort to restore order to the unit, or maliciously and sadistically to cause harm to Smith.   Upon further consideration of this evidence, a factfinder may determine which version of the evidence is more credible but, at this stage of the proceedings, this court may not weigh such credibility. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that disputed facts prohibit a finding that Hahn is entitled to judgment as a matter of law on Smith's Eighth Amendment claim.

The DOC Defendants' Motion and Memorandum of Law further argue that Hahn is entitled to qualified immunity on the plaintiff's claim.   In ruling on an issue of qualified immunity, a court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. *Id.*   If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case.   *Id.*

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts may decide to address whether the right is clearly established first.   The *Pearson* Court noted that the doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."   555 U.S. at 230.   Here, the defendants assert that they are entitled

15

to qualified immunity because Smith has failed to proffer sufficient evidence to demonstrate the violation of any clearly established constitutional right.

As noted in the DOC Defendants' Memorandum:

> Federal authority on qualified immunity establishes that "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"   *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998).   "[G]eneral functions as a correctional officer, like most law enforcement officers, are broadly characterized as discretionary, requiring the use of his discretionary judgments and decisions." *Cochran v. W. Va. Reg'l Jail & Corr. Facility Auth.*, 2014 U.S. Dist. LEXIS 89893, * 15-16 (S.D. W. Va. July 2, 2014) (*quoting West Virginia Regional Jail and Correctional Facility Authority v. A.B.*, No. 13-0037, 2014 W. Va. LEXIS 253, section III(A)(5) (Mar. 27, 2014).

(ECF No. 120 at 11-12).   The DOC Defendants further contend that defendant Hahn "acted in accordance with controlling West Virginia Division of Corrections' policy, Policy Directive 312.02, and the Use of Force Model, when Plaintiff was sprayed with two (2) one-second bursts of OC.   Additionally, it is clear that Lt. Hahn sprayed the Plaintiff with OC for the purpose of restoring order and controlling an unruly and recalcitrant inmate." (*Id.* at 12).   Thus, the defendants contend that Smith cannot demonstrate that Hahn's conduct violated a clearly established constitutional right and, therefore, all of the defendants are entitled to qualified immunity as a matter of law.   (*Id.*)

Smith, on the other hand, contends "there was clearly established statutory and/or constitutional rights in place of which a reasonable person would have known."   (ECF No. 143 at 18).   Specifically, Smith refers to the Supreme Court and Fourth Circuit decisions in *Hudson*, *Whitley*, *Williams*, *Farmer*, *Slakan*, *Randall*, *Browning* and *Wilkins*, which are cited and discussed herein and in the parties' briefs.   (*Id.*)   Smith

further contends that the evidence of record demonstrates that the actions of Hahn and Hypes were "not made in a good faith effort to maintain and restore order" and, thus, deprived him of his clearly established constitutional rights.   Therefore, he contends that they are not entitled to qualified immunity for their conduct.   (*Id.*)

Although the DOC Defendants did not file a reply brief, on February 3, 2017, they filed a Motion for Leave to Supplement Motion for Summary Judgment (ECF No. 151), in which they sought to file a Supplemental Memorandum addressing the issue of qualified immunity, relying on the Supreme Court's recent decision in *White v. Pauly*, 580 U.S. ___, No. 16-67 (Jan. 9, 2017), which is attached to their proposed Supplemental Memorandum.   On February 13, 2017, Smith objected to the DOC Defendants' Motion for Leave to File Supplemental Memorandum on the basis that it is untimely.   (ECF No. 152).   However, the undersigned has granted the defendants' motion for leave and will consider the Supplemental Memorandum.

In *White*, which involved a Fourth Amendment issue that is not in any way factually apposite herein, the Court ultimately granted qualified immunity under the circumstances of that case, finding it necessary to "reiterate the longstanding principle" that "'clearly established law' should not be defined 'at a high level of generality.'"   *Id.* at 6 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).   Thus, the Court determined that qualified immunity should be granted because that case did not involve a "run-of-the-mill Fourth Amendment violation."   *Id.* at 7.

The DOC Defendants encourage this court to find that the instant case is similar to *White* in that this is not a "run-of-the-mill" Eighth Amendment case because "here Plaintiff alleges that he created a disturbance by flooding his cell, but the flooding stopped

17

prior to the use of force due to the water being turned off."   (ECF No. 151-1, Ex. A at 3).

Thus, they assert that this court should grant qualified immunity to all of the defendants

herein because there is no clearly established authority on point.

However, as noted by Smith in his Response, in *Slakan v. Porter,* 737 F.2d 368 (4th

Cir. 1984), the Fourth Circuit upheld a finding of excessive use of force against an inmate

who, though locked in his isolation cell, was exhibiting disruptive behavior, including

spewing obscenities at correctional officers and reaching through the bars of his cell door

to hit an officer.   The Court held that, while such behavior warranted disciplinary action,

"[t]he prisoner was locked in a one-man cell at the time of the incident and posed no direct

physical threat to other inmates or any of the guards" and the use of tear gas, water hoses

and billy clubs "unquestionably crossed the line separating necessary force from

brutality."   *Id.* at 372.   The Court also held that the evidence in *Slakan* was sufficient to

establish supervisory liability against the Warden, the Director of Prisons and the

Secretary of Corrections, and that those defendants were also not entitled to qualified

immunity.   *Id.* at 373-377.   The *Slakan* Court specifically stated:

> Nor can these officials seriously argue that the application of eighth
> amendment liability to their actions represents a novel or unanticipated
> development in the jurisprudence governing § 1983 actions. . . . Whether or
> not these officials were actually aware of their constitutional and statutory
> obligations, they are presumed to know what the law requires, and may be
> legally accountable for conduct that violates fixed standards.

*Id.* at 377.

Additionally, although not cited by Smith in his brief, in *Iko v. Shreve*, 535 F.3d

225, 240 (4th Cir. 2008), the Fourth Circuit reiterated that, while "some dispersal of

pepper spray may be warranted in carrying out a cell extraction," and pepper spray "is a

commonly used method of incapacitating inmates for this purpose," "it is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas *or other chemical agents in quantities greater than necessary* or *for the sole purpose of infliction of pain*."  (Emphasis added).  Citing to *Iko* and *Williams, supra*, 77 F.3d at 763, which were decided well before the incident herein, the Fourth Circuit has acknowledged that "our precedent establishes that use of pepper spray on a docile prisoner could qualify as excessive force."  *Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014) ("A jury could find that the amount of force used by the officers was not justified if they accepted Boone's allegations that he was not acting belligerently and that the officers beat him and deployed pepper spray for some other reason than to maintain or restore discipline . . . .").  Here, taking the evidence in the light most favorable to Smith, there are disputed facts as to whether Smith was actually flooding or engaged in any other behavior that necessitated <u>any</u> deployment of pepper spray at that time.

The undersigned believes that the instant case is distinguishable from *White* because there was clearly established law at the time of this incident that specifically concerns the use of chemical agents on an inmate locked in an isolation cell who poses no direct threat to himself, others or prison property at the time the chemicals were deployed.  Such authority may serve as "fair warning" to the defendants herein that their conduct under such circumstances was not warranted.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  Taking the evidence in the light most favorable to Smith, a reasonable officer should have known that pepper spraying an inmate who had previously, but was not currently flooding his cell, and who was not otherwise creating a disturbance at that time, could be construed as malicious and sadistic punishment and not an action done in a good

19

faith effort to restore order.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that defendant Hahn is not entitled to qualified immunity and judgment as a matter of law on Smith's Eighth Amendment claim against him.

### B. Smith's Eighth Amendment claim against Hypes.

In his verified Complaint, Smith also alleges that defendant Joshua Hypes "got into a pushing and shoving match over who was going to spray plaintiff." (ECF No. 1 at 8, ¶ 34). Smith further alleges that Hypes violated his rights under the Eighth Amendment by "failing to stop the use of force and ignoring policy and joining in on the use of force on plaintiff . . ." (*Id.* at 35, ¶ 178).

However, the DOC Defendants assert that Hypes was not present at the time of this incident because he was assisting with the decontamination process of another inmate who was pepper sprayed shortly before Smith. (ECF No. 120 at 7). Rather, as supported by Hahn's Memorandum to Major Robert Rhodes summarizing the incident (ECF No. 119, Ex. B), as well as the incident reports of Hypes and Boychuck (*id.*, Exs. C and D), the DOC Defendants contend that it was Boychuck who accompanied Hahn to Smith's cell and who lowered the food tray slot when Hahn pepper sprayed Smith. Consequently, the DOC Defendants assert that there is no genuine issue of material fact concerning Hypes' presence during the subject incident and, thus, Hypes is entitled to judgment as a matter of law on Smith's claim against him. (ECF No. 120 at 7).

Smith, however, persists in his assertion that Hypes was the officer who accompanied Hahn. While acknowledging, during his deposition, that he "could be wrong" (ECF No. 143-1 at 15, 60:15-19), Smith also asserted that he was "99 percent

20

certain it was Joshua Hypes coming up them steps." (*Id.* at 8, 30:14-15).   Smith's deposition testimony further contended that the incident reports indicating that Boychuck was with Hahn and that Hypes was assisting inmate Ramsey were "falsified" because "Hypes had already been in a lot of issues involving use of force."   (*Id.*, 60:10-14).   The affidavits and declarations of inmates Douglas Ganoe and Fred Douty also identify Hypes as the officer who was with Hahn during this incident.   (ECF No. 143-1 at 44, 46).[7]

Essentially, Smith contends that Hypes failed to intervene and protect him.   His affidavit states: "During the single deployment of OC spray lasting 3-6 seconds in time Defendant Hypes never once said 'stop,' 'no,' 'don't,' or 'that's enough,' despite standing directly behind Defendant Hahn at the time."   (ECF No. 143-1 at 42-43, ¶ 30). Generally, an "officer may incur § 1983 liability only through affirmative misconduct." *Randall v. Prince George's Cnty., Md.,* 302 F.3d 188, 202 (4th Cir. 2002).   "Although personal liability premised on an omission is a disfavored concept, it is well-established that an omission to act, when coupled with a duty to act, may provide a basis for liability." *Id.* at 203.   An "officer may not stand by idly while a citizen's constitutional rights are violated by another officer; he has an affirmative duty to intercede on the citizen's behalf."

---

7  Smith's own affidavit, which was executed on June 8, 2016, two years after his verified Complaint was filed, and four months after his deposition, suggests that both Hypes and Boychuck were with Hahn at the time he was sprayed.   The affidavit states:

> During the decontamination of inmate Ramsey, Defendant[s] Hahn and Hypes, with officer Boychuck returned to my cell.   My bean hole was [then] opened at which time Defendant[s] Hahn and Hypes got into a shoving match trying to spray me with OC. Ultimately, it ended up being Defendant Hahn who sprayed me.

(ECF No. 143-1 at 42, ¶ 25).   Thus, Smith continues to dispute the DOC Defendants' contention that Hypes was not present during this incident.

*Browning v. Snead*, 886 F. Supp. 547, 552 (S.D. W. Va. 1995).

The Fourth Circuit has recognized "a cause of action for bystander liability 'premised on a[n] . . . officer's duty to uphold the law and protect the public from illegal acts, regardless who commits them.'" *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 416-17 (4th Cir. 2014) (quoting *Randall*, 302 F.3d at 203). Bystander liability is established if: (1) an officer knows that a fellow officer is violating an individual's constitutional rights: (2) the officer has a reasonable opportunity to prevent the harm; and (3) the officer chooses not to act. *Randall*, 302 F.3d at 204; *see also Bacon v. Wood*, 616 F. App'x 601 (4th Cir. 2015) (citing to this analysis with regard to a bystander liability claim against a correctional officer concerning an inmate's deliberate indifference claim).

The crucial element of bystander liability is whether the officer had a reasonable opportunity to prevent the harm. In fact, in a recent case, another judge of this court granted summary judgment on a bystander liability claim, finding that the defendants against whom that claim was brought did not have a reasonable opportunity to intervene because the circumstances suggested that the incident occurred "without warning" and in a "very brief" time. *See Harper v. Blagg,* No. 2:13-cv-19796, 2015 WL 6509131, *14 (S.D. W. Va. Oct. 28, 2015) (Johnston, J).

Because the DOC Defendants assert that Hypes was not even present for this incident, their Motion and Memorandum of Law do not address the substance of any failure to intervene claim. They simply contend that there is no genuine issue of material fact concerning Hypes' presence and assert that he is entitled to judgment as a matter of law on that basis.

However, Smith's evidence, including the affidavits or declarations of the other inmates on his pod who were eye or ear witnesses, suggest that Hypes was present at the time of this incident.   Furthermore, Smith's Response to the Motion for Summary Judgment reiterates his contention that he could not have been perceived as a threat at the time that Hahn and Hypes entered the pod because "around 20 minutes had passed since Smith stopped flooding" and "around 10-20 minutes more had passed decontaminating inmate Ramsey."   (ECF No. 143 at 7).   Smith further contends that the "shoving match" between Hahn and Hypes concerning who would be the first to spray him "displayed [Hypes'] unwillingness to intervene and protect Smith with such unprofessional conduct."   (*Id.*)

At this stage of the proceedings, this court cannot accept the credibility of the defendant's incident reports and memorandum over Smith's verified Complaint and affidavits.   In fact, the court must presently take the evidence in the light most favorable to Smith, which suggests that Hypes was present and, not only failed to intervene to stop Hahn from spraying Smith, but was allegedly fighting with Hahn over who would be able to spray him.   Under the totality of the circumstances presented by such evidence, and based upon the clearly established law concerning bystander liability for the failure to intervene discussed above, the undersigned proposes that the presiding District Judge **FIND** that there are genuine issues of material fact that prohibit a finding that defendant Hypes is entitled to judgment as a matter of law on Smith's Eighth Amendment claim

against him, and further **FIND** that he is not entitled to qualified immunity on that claim.[8]

### C.    Supervisory liability claims.

Smith's verified Complaint also asserts claims of supervisory liability against David Ballard, the Warden of MOCC, and Jim Rubenstein, the Commissioner of the West Virginia Division of Corrections.[9]    Smith's verified Complaint specifically alleges the following with respect to the conduct of Ballard and Rubenstein:

> 182.    By defendant Ballard telling his officers that Quilliams II unit is placed under Martial Law and letting his officers use chemical agents on inmates for simple rules violations and not investigating the complaints and grievances and not encouraging his officers to follow policy or try to temper the situation, he has violated plaintiff's rights under the Eighth Amendment to the United States Constitution and causing plaintiff pain, suffering, emotional

---

[8]  Smith's Response also asserts, for the first time, that Hahn and Hypes should also be held liable for "fail[ing] to protect" Smith after he was placed back in his cell.   He claims that he "advised Hahn and Hypes of his intention to harm himself" and "they disregarded [those] warnings."   (ECF No. 143 at 16).   Smith further contends that he "told Hahn and Hypes that he was contemplating suicide when he was being decontaminated."   (*Id.*)   He cites to his "Exhibit 8," which is the decontamination video.   However, the Complaint contains no such allegations against Hahn or Hypes.   (ECF No. 1).   Furthermore, a review of the decontamination video demonstrates that, while Smith told Hahn that he was struggling with issues since his brother died, and "needed help," he never stated that he was contemplating hurting himself. Moreover, Smith's alleged suicide attempt occurred approximately one week after this incident and there are no allegations or evidence to establish, either that Hahn and Hypes were the officers who cleaned the cell and placed Smith back in his cell on September 1, 2013, or that they had any specific involvement with him during the course of that week after this incident.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that this issue is not properly before this court because it was raised for the first time in a response brief.   *See Bell v. Cone*, 556 U.S. 449, 482 (2009); *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006) (courts generally do not consider issues first mentioned in a reply brief). Additionally, to the extent that the District Judge may determine that this claim is properly before the court, the undersigned proposes that the presiding District Judge **FIND** that there is no evidence to support this claim and, thus, no genuine issue of material fact thereon.   Thus, the District Judge should **FIND** that defendants Hahn and Hypes are entitled to judgment as a matter of law on such a claim.

[9]  While Smith's Complaint may also be suggesting that defendants Hahn and Hypes should be held liable on a claim of supervisory liability, he has not alleged any facts demonstrating that they served in a supervisory role.   Furthermore, because the undersigned is recommending that the Eighth Amendment claims against Hahn and Hypes proceed to trial, there appears to be no basis for separately addressing their conduct under the guise of supervisory liability.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that defendants Hypes and Hahn are entitled to judgment as a matter of law on any supervisory liability claim alleged against them.

distress, severe emotional distress, and physical injury.

183. By defendant Jim Rubenstein not investigating all the letters, complaints and grievances appealed to him all the way from 2009 about the excessive use of force claims and inadequate physical and mental health care, he has violated plaintiff's rights under the Eighth Amendment to the United States Constitution and causing plaintiff pain, suffering, emotional distress, severe emotional distress and physical injury.

(*Id.*, ¶¶ 182-183).

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit clearly established that a supervisor may be liable for the actions of his subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved, prior constitutional violations. Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." 13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)).

The DOC Defendants' Memorandum of Law addresses the *Shaw* elements in relation to Smith's claims against defendants Ballard and Rubenstein. (ECF No. 120 at 13-14). The Memorandum of Law asserts that Smith has not alleged, and cannot establish, that either of these supervisors had actual knowledge of "a pervasive and unreasonable risk" of constitutional injury to the plaintiff. (*Id.*) Their Memorandum of Law states:

In the instant action, Plaintiff has alleged that Warden Ballard declared Martial Law in the Quilliams Units, is responsible for Policy, and it was "his" officers [who] sprayed him. *See [Smith's Dep., ECF No. 119,] Exhibit A, page 44, lines 3-13.* Plaintiff further alleges that Commissioner Rubenstein did not adequately respond to his grievances. *Id. at page 49,*

25

*lines 1-15.*   First, Warden Ballard's Affidavit establishes that [] he has never used the term Martial Law in a corrections environment.   *See Exhibit E.* Second, the Plaintiff has conceded that he has never heard Warden Ballard make any statements regarding Martial Law and has no first-hand knowledge of the issue.   *See Exhibit A, page 45, lines 15-17.*   Finally, the Plaintiff has failed to point to a single use of force that was found to be excessive wherein no action was taken against the subject Correctional Officers.   Essentially, the Plaintiff is relying on his own speculation, without any support facts, to assert these claims.

(*Id.* at 14).

Smith's Response contends that Rubenstein and Ballard are the only individuals with authority to make and enforce policies or customs at MOCC.   (ECF No. 143 at 9). Smith further contends that "Rubenstein and Ballard have tacitly authorized a policy or custom known as Martial Law: No Efforts to Temper in Segregation."   (*Id.*)   In support of this contention, Smith offers a unit team request form he submitted on August 26, 2013 (approximately one week before the incident that is the subject of this Complaint), stating "I was told by an officer that Q2 unit of MOCC was under Martial Law. Is this true?"   (ECF No. 143-1 at 65).   The unit team request form contains a stamp indicating that it was received by the Quilliams 2 staff on August 29, 2013.   (*Id.*)   The form also contains a reply allegedly authored and signed by Lt. Brian Penick on September 9, 2013, stating, "Per Warden, Martial Law is a condition that MOCC utilizes."   (*Id.*)

Smith also relies upon a Memorandum from Major Robert E. Rhodes to Brian R. Penick and other correctional staff, including Ballard, dated September 9, 2013, concerning "protocol" and stating "[w]e do not have to give efforts to temper to those locked up in our Seg units . . . ." (ECF No. 143-1 at 68), and an audio recording of a disciplinary hearing of another inmate during which Correctional Officer Jim Patterson acknowledged the existence of the "Martial Law" policy.   Smith's Response asserts

26

"stated on record is correctional officer Jim Patterson explaining that Captain Ronnie Williams said the Warden ordered Martial Law; and that the Warden ordered subordinates to give inmates the business via OC spray."   (ECF No. 143 at 9 and 143-1, Ex. 9 [referred to by Smith as Ex. 4]).   Smith further contends that such an order "unequivocally demonstrates the malicious and sadistic intent behind this policy or custom."   (*Id.*)

> Smith's Response further states:
>
> In a grievance form filed by inmate Fred Douty, he asked Rubenstein and Ballard to stop enforcing Martial Law and make efforts to temper in segregation.   However, Douty's request was denied stating "[p]er policy directive there are no efforts to temper in segregation."   ([ECF No. 143-1 at 70, Ex. 11 [referred to as Ex. 6(a) by Smith]).   This clearly shows they are aware of this policy or custom; and training of subordinates at MOCC centers on no efforts to temper in segregation.   Under the theory of Martial Law, subordinates can use force on inmates locked alone in a single-man cell[] for minor infractions such as using obscenities when talking.   (Smith Aff. 7).   This was the policy or custom in effect when Smith was sprayed by Hahn.   (Smith Dep. 47:1-24 and 48:1-12).

(ECF No. 143 at 9-10).   Smith has also offered an inmate grievance filed by inmate Casey Rygh on August 18, 2012, more than a year before Smith's incident, in which officers deployed pepper spray and a stinger grenade into Rygh's cell and then placed him in a restraint chair for refusing to return his food tray.   (ECF No. 143-1 at 71-72).   Rygh's unit manager denied the grievance stating in pertinent part, "efforts to temper are not needed or required."   (*Id.* at 71).   Ballard subsequently upheld this response stating, "the captain was correct in his response."   (*Id.*)

The undersigned notes that some of the evidence relied upon by Smith was generated after the incident that is the subject of this civil action.   Nevertheless, such evidence was created in close proximity to the time of this incident and suggests the

27

existence of a policy or custom that pre-dated Smith's incident.

Additionally, although Warden Ballard specifically denies ever using the term "Martial Law" in connection to a correctional facility, he acknowledges that a policy directive has been implemented stating that "officers are not required to utilize confrontation avoidance measures before applying oleoresin capsicum, or other appropriate force, against a non-compliant inmate" in the segregation units. Furthermore, although the DOC Defendants dispute the validity of the unit team request form allegedly authored by Brian Penick, contending that it was forged, the court may not judge the credibility of each side's evidence at this stage of these proceedings. That is a matter for a jury.

Smith has alleged specific facts that could allow a factfinder to draw a reasonable inference that Ballard has enforced a policy or procedure permitting uses of force that may not be justified under the circumstances, otherwise known at the prison as "Martial Law: No Efforts to Temper in Segregation." Thus, there are genuine issues of material fact as to whether defendant Ballard authorized the unconstitutional and excessive use of force on the segregation units at MOCC.

In *Shaw*, the Fourth Circuit held that "liability is ultimately determined by pinpointing the person/persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." 13 F.3d at 799. Construing the evidence in the light most favorable to Smith, there are genuine issues of material fact concerning whether excessive force against Smith was used or permitted by Ballard's subordinate officers and whether he sanctioned such force. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Ballard is not

28

entitled to qualified immunity or judgment as a matter of law on Smith's supervisory liability claim against him.

However, Smith fails to present sufficient evidence of actual or constructive knowledge by defendant Rubenstein of the alleged misconduct of his subordinates. Smith suggests only that Rubenstein may be held liable due to his role in receiving and affirming administrative remedies.   However, it is well-established that denying a prisoner's grievances, by itself, "is not the type of personal involvement required to state an [Eighth Amendment] claim."   *See, e.g., Lowe v. Matheney*, No. 2:13-cv-22416, 2015 WL 5795867 *9 (S.D. W. Va. Sept. 30, 2015) (Goodwin, J.) (inadequacy of allegations involving supervisory liability claim based upon denial of grievances); *see also Larson v. Meek*, 240 F. App'x 777, 780 (10th Cir. 2007); *Ferris v. Jones*, No. 4:14-cv-454, 2015 WL 4668297, at *9 (N.D. Fla. Aug. 5, 2015). Thus, Smith's allegations concerning Rubenstein's supervisory liability are largely conclusory, speculative and unsupported by the record.   For these reasons, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact concerning defendant Rubenstein's liability and, therefore, he is entitled to qualified immunity and judgment as a matter of law on Smith's claims against him.

## <u>RECOMMENDATION</u>

Based upon the proposed findings contained herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendant's Motion for Summary Judgment (ECF No. 119) with respect to Smith's supervisory liability claims against defendants Rubenstein, Hypes and Hahn, and any claim against defendants Hypes and Hahn for failure to protect Smith from harm concerning his suicide attempt

(if such a claim can be read into the verified Complaint).   It is further respectfully **RECOMMENDED** that the presiding District Judge otherwise **DENY** the Motion for Summary Judgment and set this matter down for trial on the remaining claims against the defendants.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge.   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.   Extension of this time period may only be granted by the presiding District Judge.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).   Copies of such objections shall be provided to the opposing parties and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to the plaintiff and to transmit a copy to counsel of record.

February 21, 2017

Dwane L. Tinsley
United States Magistrate Judge